Slip Op. 15-70

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| UNITED STATES,<br><br>           Plaintiff,<br><br>v.<br><br>CTS HOLDING, LLC,<br><br>           Defendant. | Before: Mark A. Barnett, Judge<br><br>Court No. 12-00327 |

OPINION

[The court denies Defendant's motion for summary judgment.]

Dated:  June 30, 2015

*Paul D. Oliver*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for plaintiff.  With him on the brief were *Joyce R. Branda*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, *Claudia M. Burke*, Assistant Director, and *Antonia R. Soares*, Trial Attorney.

*Jason P. Wapiennik*, Great Lakes Custom Law, of Livonia, MI, argued for defendant.

Barnett, Judge:  Defendant,[1] CTS Holding, LLC ("CTS"), moves, pursuant to USCIT Rule 56, for summary judgment against Plaintiff, United States, in this duty recovery and penalty action.  (*See generally* Mot. Summ. J. ("Mot.") (ECF No. 27).)  Defendant contends that the court lacks subject matter jurisdiction over the penalty claim because U.S. Customs and Border Protection ("Customs") did not perfect its claim at the administrative level.  (Mot. 7.)  Defendant also asserts that Plaintiff may not seek recovery from it as successor in interest to TJ Ceramic Tile & Sales Import, Inc. ("TJ"),

---

[1] Plaintiff has voluntarily dismissed Philip Mularoni from the action.  (ECF No. 44.)

the entity that imported the subject merchandise.  (Mot. 7-8.)[2]  Plaintiff opposes the

motion.  (*See generally* Opp'n (ECF No. 34).)  For the reasons provided below, the

court denies Defendant's motion.

BACKGROUND AND PROCEDURAL HISTORY

This case arises from TJ's importation of forty entries of granite and stone

polishing machines between August 6, 2004, and September 14, 2006.

**A.  TJ Ceramic, Inc.**

TJ, a family business, sold ceramic, tile, marble, granite, and other related

products from the time of its incorporation on January 2, 1962, through January 2011.

(Philip Mularoni Dep. ("PM Dep.") 16:14-17, 24:4-6, Aug. 1, 2014; Kathleen Mularoni

Dep. ("KM Dep.") 31:5, July 31, 2014.)  Around 1975, Philip Mularoni ("Mr. Mularoni")

and his brother, Richard Mularoni, purchased TJ from their parents, and, in 1991, Mr.

Mularoni became the company's sole owner and president.  (PM Dep. 13:7-18, 14:7-

13.)  In 1996, TJ began importing Italian straight edge polishing machinery with cut and

polish capabilities, which accounted for 60% to 75% of the company's sales.  (PM Dep.

24:21-23, 27:12-13, 60:9-14; Mot. App. ("DApp.") Tab R.)  At the time of its dissolution,

TJ operated under the following assumed names: Ceramic Tile Sales Inc., T.J. Imports

Inc., TJ Marble & Granite Shop, Marmo Meccanica U.S.A., Sileston of Michigan, Inc.,

Delta Diamond Tools, and Marble & Granite Gallery.  (Opp'n App. ("PApp.") 137-51.)

---

[2] In its moving brief, Defendant asserted that Customs misclassified the subject
merchandise and that the correct classification was duty free.  (Mot. 8.)  During oral
argument, however, Defendant abandoned this argument.  (Hr'g Tr. 10:35, May 20,
2015.)

On June 20, 2006, TJ secured a loan from Huntington National Bank ("Huntington").  (PApp. 202.)  From 2007 to 2008, TJ's gross sales fell steeply.  (PApp. 400, 412.)  On June 18, 2010, Huntington filed suit against TJ and Mr. Mularoni in Michigan state court, claiming that they owed Huntington over four million dollars.  (PApp. 202.)  In the fall of 2010, TJ's assets were appraised at $335,000.  (PM Dep. 93:17-22, 94:1-7.)  On January 20, 2011, Huntington entered into a settlement agreement with TJ and agreed to dismiss the litigation, with prejudice and without costs, in exchange for $500,000.  (PApp. 203-04.)  Due to its continuing deterioration, TJ lacked the revenue to fund the settlement.  (PM Dep. 104:10-13, 114:13-20.)  To pay off Huntington, TJ relied on a $500,000 loan that it obtained from Tile Holding, LLC in exchange for rights, title, and interest in any and all of TJ's assets.  *See infra*.  On the last Friday of January 2011, Mr. Mularoni held an office meeting and announced TJ's closure.[3]  (Michelle Wurst Dep. ("MW Dep.") 12:5-8, 21-23, July 31, 2014.)  On July 15, 2011, six months after the company ceased operations, TJ entered into automatic dissolution.  (DApp. Tab G.)

**B.  Tile Holding, LLC**

On January 6, 2011, Tile Holding, LLC ("Tile Holding") was organized, with Mr. Mularoni as its resident agent.  (PApp. 197, 199 (Tile Holding Articles of Organization).)  John Moran, Mr. Mularoni's son-in-law, who had worked at TJ for eight years, served as

---

[3] It is unclear from the record why TJ closed down and whether Huntington or Tile Holding, LLC, foreclosed on TJ.  (*Compare* Michelle Wurst Dep. 12:5-8, 21-23, July 31, 2014, *with* CTS Corp. Rep. Dep. 66:7-12, 22-25, Aug. 1, 2014.)  This factual question, however, is immaterial to the present motion.

its president.  (KM Dep. 39:16-20, 106:17-25.)  On January 20, 2011, the day of the

aforementioned settlement agreement between TJ and Huntington, TJ secured a loan

from Tile Holding to pay off Huntington.  (PApp. 197.)  Tile Holding received a security

interest conveying all rights, title, and interest in any and all of TJ's assets, in return for

a loan of $500,000.  (DApp. Tab H.)

### C.  CTS Holding, LLC

CTS also was organized on January 6, 2011.  (PApp. 108; DApp. Tab F; KM

Dep. 49:19-25.)  Its articles of organization list Kathleen Mularoni ("Ms. Mularoni"), Mr.

Mularoni's wife, as 99% owner of the company, and Meghan Moran, the Mularonis'

daughter, and wife of John Moran, Tile Holding's president, as owner of the remaining

1%.  (PApp. 121-22; KM Dep. 59:10-21, 98:12-23.)  A 2013 Dun & Bradstreet, Inc.

report lists Mr. Mularoni as a member of CTS.  (PApp. 244.)

CTS raised capital by obtaining loans from Ms. Mularoni and friends of the

Mularoni family (the "lenders"), totaling $500,000.  (DApp. Tab H (documenting the

source of $400,000 of the $500,000; the source of the remainder has not been

addressed, but is immaterial for purposes of this motion).)  As a condition for providing

the loans, the lenders insisted that a new company be formed "that had no attachments

to the old company [TJ] whatsoever" and that Ms. Mularoni serve as its manager.  (KM

Dep. 59:10-21; CTS Corp. Rep. Dep. ("CTS Dep.") 73:19-23, Aug. 1, 2014.)  CTS

subsequently lent this money to Tile Holding in exchange for the right, title, and interest

in any and all assets of TJ.  (DApp. Tab H; PApp. 208.)

CTS occupies the same location that TJ occupied, at 23455 Telegraph Road, Southfield, MI, 48033.  (DApp. Tab J.)  On December 1, 2010, thirty-seven days before CTS was organized, Ms. Mularoni signed a lease agreement, on behalf of CTS, with Mr. Mularoni, on behalf of Phil Mularoni Investments, for the building location.  (PApp. 108, 113-20 (Lease Agreement).)  CTS uses TJ's website address because the address "was pre-paid at the time CTS acquired it as an asset, and because CTS makes no internet sales and generally does not update its website to even accurately reflect store hours."  (DApp. Tab F.)  CTS's telephone number also is the same as TJ's.  (MW Dep. 60:3-5.)  When CTS initially received phone calls asking for TJ, Michelle Wurst, CTS's showroom manager, who answers the phones, would respond, "This is Ceramic Tile & Stone," and not claim to be TJ.  (MW Dep. 60:21-22.)  In addition, CTS possesses the TJ customer list, which contains information about past costumers and their purchases. (CTS Dep. 45:10-15.)  CTS asserts that it does not solicit business from the list and that most of the company's sales come from one-time customers.  (CTS Dep. 90:5.)  CTS does not use any contractual relationships entered into by TJ, but does share common vendors for certain commodity items.  (DApp. Tab F; CTS Dep. 54:2-19.)

On January 18, 2011, prior to TJ's entering into the security agreement with Tile Holding, and before Tile Holding entered into the security agreement with CTS, TJ placed an order with Jan Signs II to change the store's sign.  (DApp. Tabs F, H, L.)  The new sign reads "Ceramic Tile and Stone / T.J. Granite and Stone."  (CTS Dep. 64:10-22.)

CTS imports Italian tile, marble, granite, and stone and sells Italian straight edge polishing machinery with cut and polish capabilities.  (MW Dep. 31:22-25.)  CTS primarily markets itself through a local newspaper.  (CTS Dep. 45:22-23.)  The company's name is written as "Ceramic Tile and Stone/ T.J. Granite and Stone" on various advertising fliers, company forms, and business cards.  (DApp. Tabs M, N.) CTS conducts business under multiple assumed names:  T.J. Granite & Stone, T&J Marble & Stone, Delta Diamond Tooling, Ceramic Tile & Stone, and Marmomachinery. (PApp. 105.)

### D.  The Employees

After TJ closed its business in January 2011, its eight employees began working at CTS the following week.  (MW Dep. 13:11-16, 15:3-4, 52:10-11.)  Ms. Wurst, TJ's office manager, became the manager of the CTS Showroom.  (KM Dep. 95:5-19.)  Her showroom manager duties are similar to her office manager duties at TJ, which included paying bills, payroll, invoicing, and purchase orders.  (MW Dep. 15:17-25, 16:18-21; KM Dep. 99:14-19.)

Ms. Mularoni had begun working for TJ in 2006.  (KM Dep. 23:1-6.)  She conducted outside sales for TJ and worked with "interior designers, architects, [and] friends selling granite for countertops."  (KM Dep. 15:3-5.)  Although employed by TJ, Ms. Mularoni said that she was unaware of the products the company sold and the litigation stemming from disputes with Plaintiff and Huntington.  (KM Dep. 23:19-24, 30:2-12.)

As manager of CTS, she signs all legal documents, deals with the company's insurance, pays taxes, and conducts outside sales.  (KM Dep. 99:2-5.)  Despite being the manager, Ms. Mularoni said that she lacks knowledge of certain of the company's decisions.  (KM Dep. 69:1-3, 6-9.)  For example, she said that she did not know who decided that CTS would obtain all of TJ's assets, but thought she might have made the decision.  (KM Dep. 71:3-10, 19-23.)  She also said that she knew that CTS gave Tile Holdings $500,000 to pay a debt, but was unsure what the debt was for.  (KM Dep. 72:8-12.)  Ms. Mularoni seeks advice and counsel from Mr. Mularoni on how to run the company.  (KM Dep. 99:24-25, 100:1.)

Mr. Mularoni was president of TJ and now directs CTS's operations and business activities.  (DApp. Tab F; PM Dep. 10:14-24, 11:2-11, 12-17; MW Dep. 30:3-6; KM Dep. 94:1-4, 7-9.)  By no later than 2013, Mr. Mularoni had become CEO of CTS.  (PApp. 244.)

### E.  The Subject Imports

TJ imported Italian straight edge polishing machinery with cut and polish capabilities between August 6, 2004, and September 14, 2006, and classified them under HTSUS 8464.20.1000, "polishing machines:  for processing of semi-conductor wafers," with a duty rate of free.  (Mot. 2 (citing Compl. ¶¶ 8-9); PApp. 520; DApp. Tab C.)  In 2006, Customs initiated an investigation and determined that the imports were

misclassified, concluding that they were polishing machines for polishing stone and

ceramic, under HTSUS 8464.20.5090, with a duty rate of 2% *ad valorem*.[4]  (PApp. 520-

21; Answer (ECF No. 15) ¶ 10.)

### F.  The Administrative Proceedings

On January 24, 2008, Customs issued a Pre-Penalty Notice to TJ, for "forty

consumption entries covering imports of granite and stone polishing machines between

August 6, 2004 and September 14, 2006."  (PApp. 215-17 ("Pre-Penalty Notice").)  The

Pre-Penalty Notice stated that the subject imports "were incorrectly classified as duty

free under 8464.20.1000 HTSUS, as polishing machines that work on semi-conductors,"

and should have been classified under 8464.20.5090 HTSUS, with a duty rate of 2% *ad*

*valorem*.  (Pre-Penalty Notice.)  The Pre-Penalty Notice further stated, "the act or

omission of misclassifying the goods was material and false," and that TJ, its agents, or

employees acted with negligence, by failing "to exercise reasonable care and

competence in the filing of entries with the material false classification."  (Pre-Penalty

Notice.)  The Pre-Penalty Notice stated a loss of revenue in the amount of $121,368.76

and proposed a monetary penalty of $242,737.52, "a sum equal to two times the loss of

---

[4] Chapter 84 of the HTSUS provides:

| | |
|---|---|
| 8464 | Machines tools for working stone, ceramics, concrete, asbestos-cement or like mineral materials or for cold working class: |
| 8464.10.00 | Sawing machines……………………………………………FREE |
| | . . . . |
| 8464.20 | Grinding or polishing machines: |
| 8464.20.1000 | For processing semiconductor wafers…..……..……FREE |
| 8464.20.50 | Other…………………….…...………….………….….……..2% |
| | . . . . |
| 8464.20.5090 | Other . . . . |

revenue, which is the lesser of the domestic value of the merchandise or two times the loss of duties, taxes and fees."  (Pre-Penalty Notice.)

TJ submitted a petition to Customs for cancellation of the Pre-Penalty Notice on July 25, 2008.  (PApp. 316.)  Among other things, TJ asserted that the alleged misclassification "was not material or false, but was the result of clerical error and/or inadvertence."  (PApp. 326.)  On October 15, 2008, TJ made a presentation to Customs, in which it responded to the Pre-Penalty Notice and requested waiver and mitigation of the proposed penalty.  (PApp. 356, 365.)  That same day, TJ, through Mr. Mularoni, executed a two-year waiver of the statute of limitations, covering the subject entries.  (PApp. 366.)  TJ renewed the waiver on July 24, 2009.  (DApp. Tab J.)  The statute of limitations expired for TJ on October 15, 2012.  (PApp. 379; DApp. Tab J.)

After reviewing TJ's response to the Pre-Penalty Notice, Customs issued a Penalty Notice to TJ on October 30, 2008.  (PApp. 371-72 ("Penalty Notice").)  Customs found that the violation of the statutes cited in the Pre-Penalty Notice occurred and concluded that mitigation of the penalty was not warranted.  (Penalty Notice.)  The Penalty Notice stated that "the act or omission of misclassifying the goods was material and false, resulting in an actual loss of revenue of $77,220.32."  (Penalty Notice.)  This figure was lower than that in the Pre-Penalty Notice because it reflected a $4,363.72 collection of duties.  (Penalty Notice.)  The Penalty Notice also demanded a penalty payment of $242,737.52.  (Penalty Notice.)  It did not state TJ's level of culpability. Following the paragraph summarizing the violation is the phrase "COMMERCIAL

FRAUD 1592," which did not appear in the Pre-Penalty Notice.  (*Compare* Penalty

Notice, *with* Pre-Penalty Notice.)

On August 28, 2009, TJ submitted a petition for mitigation of the penalty.  (PApp.

355.)  The petition requested cancellation of the penalty and argued that "under all the

circumstances it is extremely difficult to craft a substantive response . . . [and] the

legitimate issues raised in the pre-penalty [notice] were never addressed by the Port."

(PApp. 356-57.)  On April 23, 2010, Customs offered to mitigate the penalty assessed

against TJ to $121,368.76, equal to the loss of duties, because TJ had no prior

violations and had taken "immediate remedial action."  (PApp. 486, 493.)  Customs

informed TJ that if TJ did not pay the outstanding loss of duties, $77,220.32, or file a

supplemental petition within sixty days, Customs would enforce the full penalty against

it.  (PApp. 486, 493.)  On July 12, 2010, TJ submitted a supplement to the petition,

(PApp. 425), and, on October 1, 2010, submitted additional materials in response to

Customs' "invitation to append additional arguments" to the supplemental petition,

(PApp. 388).  Of note, TJ argued that it is a small business entity and entitled to waiver

of penalty under the Small Business Regulatory Enforcement Fairness Act ("SBREFA"),

and that it satisfied the SBREFA's "absence of fraud" requirement for waiver.  (PApp.

389, 392.)  TJ additionally stated that "the alleged violation involves a claim of

negligence and did not involve criminal or willful conduct."  (PApp. 391.)  It noted that

the lack of criminal or willful conduct was "confirmed by the customs pre-penalty and

penalty notices issued in this matter alleging negligence."  (PApp. 392.)  Further, TJ

stated that "[C]ustoms maintained its allegation of negligence claims in headquarters internal advice letter [sic]."  (PApp. 392.)

On January 11, 2011, and July 15, 2011, TJ submitted offers in compromise, which Customs ultimately rejected.  (Compl. ¶ 20.)  In the first offer, TJ stated that it was willing to pay Customs $89,320.65.  (PApp. 289.)  The second offer raised the figure to $90,892.31.  (PApp. 256.)

## G.  The Present Suit

On October 12, 2012, Plaintiff filed suit against Defendant, seeking recovery of unpaid Customs duties and penalties, pursuant to 19 U.S.C. § 1592.  (Compl. ¶ 1.) Customs asserts that Defendant is liable for $242,737.52 in penalties and $13,931.54 in duties for negligence-based violations committed by TJ and CTS.  (Compl. ¶ 43.) Defendant now moves for summary judgment, pursuant to USCIT Rule 56.  The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1582.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

The court will grant summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" based on the "materials in the record."  USCIT R. 56(a), (c)(1).  The burden of establishing the absence of a genuine issue of material fact lies with the moving party.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The court must view the evidence in the light most favorable to the non-movant and may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 255 (1986) (citation omitted).  A genuine factual issue exists if,

taking into account the burdens of production and proof that would be required at trial, sufficient evidence favors the non-movant such that a reasonable jury could return a verdict in that party's favor. *Id.* at 248.

To defeat summary judgment once the moving party has met its burden, the nonmoving party may not simply rely on the pleadings, but must "'cit[e] to particular parts of materials in the record' to establish the 'presence of a genuine dispute' warranting trial." *Macclenny Prods. v. United States*, 38 CIT __, __, 963 F. Supp. 2d 1348, 1358 (2014) (brackets in original) (quoting USCIT R. 56(c)). "'[I]f a party 'fails to properly address another party's assertion of fact,' that assertion of fact may be deemed 'undisputed for purposes of the motion.'" *Id.* (quoting USCIT R. 56(e)(2)). In other words, there must exist more than "a scintilla of evidence" to support the non-moving party's claims, *Anderson*, 477 U.S. at 252; conclusory assertions will not suffice, *see* USCIT R. 56(e). Similarly, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts" when ruling on the motion. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

DISCUSSION

## A. Perfection of the Penalty Claim

### 1. Defendant's Contentions

Defendant asserts that the court lacks subject matter jurisdiction over Plaintiff's penalty claim because Customs failed to perfect its claim, pursuant to 19 U.S.C.

§ 1592(b), at the administrative level.[5]  (Mot. 8-10.)  Specifically, it avers that, although

the Pre-Penalty Notice alleged a violation based on negligence, the Penalty Notice

"made no allegation to the level of culpability (or alternatively, alleged fraud where it

says 'COMMERCIAL FRAUD 1592.'[)]"[6]  (Mot. 10 (citing DApp. Tabs C & D).)

According to Defendant, Customs' failure to include the level of culpability in the Penalty

Notice, or the agency's changing the level of culpability in the Penalty Notice, is fatal to

the penalty claim.  (Mot. 10.)[7]

-------------------------

[5] Defendant characterizes Customs' alleged failure to state expressly the level of culpability in the penalty notice as a failure of Customs to perfect its penalty claim, thereby depriving this court of subject matter jurisdiction.  It is well settled, however, that "'when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character.'"  *United States v. Nitek Elecs., Inc.*, 36 CIT __, __, 844 F. Supp. 2d 1298, 1303 (2012) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 516 (2006)).  Because § 1592(b) does not indicate that Customs' administrative procedures are jurisdictional, and these administrative procedures are not restated or otherwise provided for in the statutory provisions that provide the court with subject matter jurisdiction over penalty actions, 28 U.S.C. § 1582, the court concludes that these administrative procedures are not jurisdictional.  *See Nitek Elecs., Inc.*, 36 CIT at __, 844 F. Supp. 2d at 1303.

[6] Defendant concedes that, "with the exception of the difference in the actual loss of revenue, the penalty notice is a verbatim rendering of paragraph 4 of Exhibit A of the Pre-Penalty Notice, without any inclusion of the level of culpability found in paragraph 5 of the pre-penalty notice."  (Mot. 10.)

[7] Defendant argues that, during the administrative proceedings, Customs alleged that the subject merchandise were "polishing machines" and fell under HTSUS 8464.20.5090.  (Mot. 27 (citing DApp. Tabs C & D).)  Now, however, Plaintiff avers that the merchandise are "polishing machines" under HTSUS 8464.20.4090, a subheading which does not exist.  (Mot. 27 (citing Compl. ¶ 10).)  Defendants insist that this discrepancy deprives the court of subject matter jurisdiction because "the administrative claim for which Customs is seeking recovery simply does not exist."  (Mot. 27 (citation and quotation marks omitted).)  It is clear from the documents submitted to the court that the difference between the alleged HTSUS subheadings is a clerical error.  (*See, e.g.*, Opp'n 24 n.7.)  The court declines to dismiss Plaintiff's claim on this basis.

### 2.  Plaintiff's Contentions

Plaintiff responds that Customs fulfilled the procedural requirements for bringing

a penalty claim.  (Opp'n 13-16.)  It asserts that when Customs issued the Pre-Penalty

Notice for a negligence violation, Customs proposed a monetary penalty of

$242,737.52, "representing two times the loss of duties, which is the formula for

negligence-based penalties under 19 U.S.C. § 1592(c)(3)(ii)."  (Opp'n 14 (citing Pre-

Penalty Notice).)  The subsequent penalty notice contained the same proposed

monetary penalty.  (Opp'n 14 (citing PApp. 213).)  Plaintiff argues that the identical

proposed penalty amounts, which were two times the alleged loss of duties, "by

definition, sought a negligence-based penalty under 19 U.S.C. § 1592(c)(3)(ii)" and put

Defendant on notice that negligence was the asserted level of culpability.  (Opp'n 14.)

Plaintiff further contends that Defendant had notice that Customs sought a negligence-

based penalty because, in efforts to mitigate the penalty at the administrative level, TJ

repeatedly acknowledged that Customs had alleged a negligence-based penalty claim

against it.  (Opp'n 14-15 (citing PApp. 318, 355, 389, 391).)  Plaintiff also urges that the

"COMMERCIAL FRAUD 1592" reference in the Penalty Notice does not indicate a

change to the alleged culpability level because the Fines, Penalties & Forfeitures

Division of Customs, which issues pre-penalty and penalty notices, "refers colloquially to

all 1592 penalty actions as 'commercial fraud.'"  (Opp'n 15 (citing HB 4400-01B, Seized

Asset Management and Enforcement Procedures Handbook, Office of Field Operations,

FP&F Division, U.S. CBP, Ch. 13 Penalty Statutes, § 13.1 (July 2011)).)

### 3. Analysis

To bring a penalty claim before the court, "Customs must perfect its penalty claim in the administrative process" according to the procedures that Congress established in subsection (b) of 28 U.S.C. § 1592.[8]  *United States v. Jean Roberts of Cal., Inc.*, 30 CIT 2027, 2030 (2006).  That subsection sets forth, in relevant part, the following pre-penalty and penalty procedures:

> If the Customs Service has reasonable cause to believe that there has been a violation of subsection (a) of this section and determines that further proceedings are warranted, it shall issue to the person concerned a written notice of its intention to issue a claim for a monetary penalty [a pre-penalty notice]. Such notice shall--(i) describe the merchandise; (ii) set forth the details of the entry or introduction, the attempted entry or introduction, or the aiding or procuring of the entry or introduction; (iii) specify all laws and regulations allegedly violated; (iv) disclose all the material facts which establish the alleged violation; *(v) state whether the alleged violation occurred as a result of fraud, gross negligence, or negligence*; (vi) state the estimated loss of lawful duties, taxes, and fees, if any, and, taking into account all circumstances, the amount of the proposed monetary penalty; and (vii) inform such person that he shall have a reasonable opportunity to make representations, both oral and written, as to why a claim for a monetary penalty should not be issued in the amount stated.

19 U.S.C. § 1592(b)(1)(A) (emphasis added).

> After considering representations, if any, made by the person concerned pursuant to the notice issued under paragraph (1), the Customs Service shall determine whether any violation of subsection (a) of this section, as alleged in the notice, has occurred. . . . If the Customs Service determines that there was a violation, it shall issue a written penalty claim to such person. The written penalty claim *shall specify all changes in the information provided under clauses (i) through (vi) of paragraph (1)(A)*. . . . At the conclusion of any proceeding under such section 1618, the Customs

---

[8] Section 1592 "does not provide any administrative process for imposing lost duty claims." *Nitek Elecs., Inc.*, 36 CIT at __, 844 F. Supp. 2d at 1309.  The Plaintiff, therefore, "need not exhaust administrative remedies" before bringing a duty recovery claim.  *Id.* (citation omitted).

> Service shall provide to the person concerned a written statement which
> sets forth the final determination and the findings of fact and conclusions of
> law on which such determination is based.

19 U.S.C. § 1592(b)(2) (emphasis added).  Thus, Customs must issue a Pre-Penalty

Notice, "followed by a Penalty Notice upon Customs' determination that a violation has

occurred."  *United States v. Rotek, Inc.*, 22 CIT 503, 509 (1998) (citing 19 U.S.C.

§ 1592(b)(2)).  The Penalty Notice must "specify all changes in the information provided

[in the Pre-Penalty Notice]."  *Id.* (brackets in original) (citation and quotation marks

omitted).  A principal function of this notice procedure is "'to give an importer an

opportunity to fully resolve a penalty proceeding before Customs, before any action in

[this court].'"  *United States v. Ford Motor Co.*, 463 F.3d 1286, 1298 (Fed. Cir. 2006)

(quoting *United States v. Optrex Am., Inc.*, 29 CIT 1494, 1500 (2005)); *accord Jean*

*Roberts of Cal. Inc.*, 30 CIT at 2035.

    Defendant concedes that, "with the exception of the difference in the actual loss

of revenue, the penalty notice is a verbatim rendering of paragraph 4 of Exhibit A of the

Pre-Penalty Notice, without any inclusion of the level of culpability found in paragraph 5

of the pre-penalty notice."  (Mot. 10.)  Moreover, the court finds that Defendant could not

reasonably have interpreted the phrase "COMMERCIAL FRAUD 1592" at the bottom of

the Penalty Notice to indicate that Customs was changing the level of culpability

asserted in the Pre-Penalty Notice.  In the Pre-Penalty Notice, Customs set forth the

level of culpability in a section expressly entitled "DETERMINATION OF CULPABILITY"

and explained the asserted level of culpability in a textual sentence.  (Pre-Penalty

Notice ("Negligence-TJ Ceramic . . . failed to exercise reasonable care and competence

in the filing of entries with the material false classification described above.").)  In the

Penalty Notice, by contrast, the phrase "COMMERCIAL FRAUD 1592" is not a part of a

sentence and is set apart from the document's primary text.  (Penalty Notice.)  Customs

thus did not reasonably appear to assert a different level of culpability in the Penalty

Notice than in the Pre-Penalty Notice.  Instead, in the Penalty Notice, Customs omitted

the level of culpability that it already had identified in the Pre-Penalty Notice, as statute

permits.  *See* 19 U.S.C. § 1592(b); *Rotek, Inc.*, 22 CIT at 509 (noting that Penalty

Notice need specify only "all changes in the information provided [in the Pre-Penalty

Notice]") (brackets in original) (citation and quotation marks omitted).  Customs

therefore abided by the procedural requirements of § 1592(b) and perfected its

negligence claim against Defendant.

In addition, Defendant's attempts to resolve the penalty claim before Customs,

prior to Plaintiff's bringing this action, demonstrate that Defendant received sufficient,

actual notice that the claim sounded in negligence.  *See United States v. KAB Trade

Co.*, 21 CIT 297, 300 (1997) (citing *United States v. Dantzler Lumber & Export Co.*, 16

CIT 1050, 1059, 810 F. Supp. 1277, 1285 (1992)) (holding that court may find notice

"where it is evident that the defendant is or should be aware of his potential liability").

After receiving the Pre-Penalty Notice, Defendant submitted to Customs a Petition for

Cancellation of Pre-Penalty Notice, in which Defendant stated that the penalty claim

was based on negligence.  (PApp. 318.)  After receiving the Penalty Notice, which did

not mention a level of culpability, Defendant submitted a Second Supplemental Petition

for Mitigation, in which Defendant specified that the penalty action was based on

negligence.[9]  (PApp. 391, 392 ("This fact is further confirmed by the customs pre-

penalty and penalty notices issued in this matter alleging negligence.").)  The petition

also sought relief under the SBREFA, (PApp. 389, 392), which is available for only

violations that "did not involve criminal or willful conduct, and did not involve fraud or

gross negligence," i.e. violations based on negligence.  *Jean Roberts of Cal., Inc.,* 30

CIT at 2037.

Because Plaintiff complied with the procedural requirements of § 1592(b), and

Defendant had notice that the penalty claim sounded in negligence, the court denies

Defendant's motion for summary judgment on this issue.  *See Rotek*, 22 CIT at 510-11.

## B.  Whether Customs May Recover from CTS

### 1.  Defendant's Contentions

Defendant asserts that the court cannot hold CTS liable for TJ's alleged § 1592

violations as TJ's successor corporation.  (Mot. 20-27.)  It avers that § 1592 contains no

language referring to successors in interest, or similar terms, and only employs the word

---

[9] The court declines to adopt Plaintiff's argument that the Penalty Notice indicated negligence because the penalty level was twice the alleged duty owed.  While the penalty amount stayed the same between the Pre-Penalty Notice and Penalty Notice, thereby supporting a lack of change in culpability, the multiple of the duty, by itself, does not indicate a negligence level of culpability.  19 U.S.C. § 1592(c) states the maximum penalty levels allowed for each potential level of culpability in a penalty action.  *See* 19 U.S.C. § 1592(c)(1)-(3) (establishing maximum penalty for fraud as "the domestic value of the merchandise; for gross negligence as the lesser of "the domestic value of the merchandise" or "four times the lawful duties, taxes, and fees[;]" and for negligence as the lessor of "the domestic value of the merchandise" or "two times the lawful duties, taxes, and fees").  The statute consequently would permit Customs to assess a penalty level of twice the alleged duty owed in penalty actions based in negligence, gross negligence, or fraud.

"person," which the Tariff Act defines to encompass "'partnerships, associations, and corporations.'"  (Mot. 12 (citing 19 U.S.C. § 1592(a)(1), (b)(1)(A)) (quoting 19 U.S.C. § 1401(d)).)  According to Defendant, if Congress wanted to include successors in the statute, it would have included a specific term, as it did in 19 U.S.C. § 1313(s), which makes drawback eligibility benefits available to "drawback successors."  (Mot. 12-13.)

Defendant also argues that the court should not read successor liability into § 1592(b) because "it appears the only time the courts have created successor liability without a clear and express statutory mandate is under labor and CERCLA [the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.*,] legislation," due to the laws' remedial purposes.  (Mot. 14 & n.3.)  Section 1592(b) penalty actions, on the other hand, are not remedial and are meant to deter.[10]  (Mot. 14-15.)

Defendant further argues that, if the court determines that successor liability is available under § 1592, Plaintiff's complaint alleges only that CTS is a "mere continuation" of TJ and avers that the facts do not support a finding that CTS is liable for TJ's violations on this ground.  (Mot. 18-19 (citing Compl. ¶¶ 26-31).)  Defendant then asserts that, under Michigan law, it does not qualify as a "mere continuation" of TJ because TJ and CTS have different management and personnel; they do not have the same general business operation; there is no continuity of shareholders between them,

---

[10] Defendant concedes that recovery actions under § 1592(d) are remedial, but contends that interpreting the cause of action to include successors would require the court to expand the definition of "person" to encompass successors within the entire statute.  (Mot. 15.)

nor did CTS's purchase of TJ's assets involve the sale of stock; TJ dissolved more than

six months after CTS's formation; and CTS has not assumed any of TJ's liabilities.

(Mot. 21-27.)

### 2.  Plaintiff's Contentions

Plaintiff asserts that the court repeatedly has held successors liable for the Tariff

Act violations of their predecessors.  (Opp'n 16.)  Plaintiff discounts Defendant's

assertion that courts may impose successor liability only for remedial purposes within

the international trade context.  (Opp'n 17.)  Moreover, Plaintiff contends that Congress

incorporated successor liability into the Tariff Act's definition of "person."  It notes that

19 U.S.C. § 1592(a) prohibits negligent actions of a "person," which the statute defines

as including "partnerships, associations, and corporations," in 19 U.S.C. § 1401(d).

(Opp'n 17.)  In turn, 1 U.S.C. § 5 states that the word "company" or "association," when

used in a federal statute, encompasses the "'successors and assigns of such company

or association, in like manner as if these last-named words of similar import, were

expressed.'"  (Opp'n 17-18 (quoting 1 U.S.C. § 5).)  Therefore, because the Tariff Act

defines "persons" to include associations and corporations, "persons" by extension also

encompass those associations' and corporations' successors and assigns.  (Opp'n 18.)

Plaintiff also avers that there are genuine issues of material fact about whether

CTS is a mere continuation of TJ.  Plaintiff asserts that the firms have common owners,

management, and employees; perform the same general business; possess similar

assumed names; and share the same place of business.  CTS also paid TJ's debts.

(Opp'n 16-24.)

### 3.  Analysis

#### a.  Successor Liability

The first issue the court must address is whether, in § 1592 penalty and recovery actions, as a matter of law, the court may hold a successor corporation liable for the violations of its predecessor.  The court previously has held that corporate successors may be held liable for their predecessors' actions in duty recovery and penalty actions. *See, e.g.*, *United States v. Adaptive Microsys., LLC*, 37 CIT __, __, 914 F. Supp. 2d 1331, 1338-42 (2013); *United States v. Ataka Am., Inc.*, 17 CIT 598, 600, 826 F. Supp. 495, 498 (1993); *see also United States v. KAB Trade Co.*, 21 CIT 297, 300-301 (1997) (stating in dicta that corporation that is "continuation" of another firm will be held liable for latter firm's liabilities in § 1592 actions).  For the following reasons, the court considers that a successor corporation may be held liable for the prior firm's liabilities.

When engaging in statutory construction, the court must "begin with the language of the statute.  The first step 'is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'"  *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)).  If the statute is "unambiguous and 'the statutory scheme is coherent and consistent,'" the inquiry ceases.  *Id.* (quoting *Robinson*, 519 U.S. at 340).

With respect to penalty claims, § 1592 states, in relevant part:

> Without regard to whether the United States is or may be deprived of all or a portion of any lawful duty, tax, or fee thereby, no *person*, by fraud, gross negligence, or negligence--(A) may enter, introduce, or attempt to enter or introduce any merchandise into the commerce of the United States by means of--(i) any document or electronically transmitted data or information,

written or oral statement, or act which is material and false, or (ii) any omission which is material . . . .

19 U.S.C. § 1592(a)(1) (emphasis added).  The duty recovery portion of the statute

states:

> Notwithstanding section 1514 of this title, if the United States has been deprived of lawful duties, taxes, or fees as a result of a violation of subsection (a) of this section, the Customs Service shall require that such lawful duties, taxes, and fees be restored, whether or not a monetary penalty is assessed.

19 U.S.C. § 1592(d).  While it is unambiguous that Customs may commence penalty

actions against "persons" who violate the statute, the absence of the word "person," or

any other limiting term, in the duty recovery provision indicates that its reach is at least

as broad as that of the penalty provision.  19 U.S.C. § 1401(d) defines "person," as

used in the Tariff Act, as "includ[ing] partnerships, associations, and corporations."  19

U.S.C. § 1401(d).  Section 5 of the Dictionary Act further provides that "[t]he word

'company' or 'association', when used in reference to a corporation, *shall be deemed to*

*embrace the words 'successors and assigns of such company or association*', in like

manner as if these last-named words, or words of similar import, were expressed."  1

U.S.C. § 5 (emphasis added).  Reading these provisions together, the word "person" in

§ 1592 properly includes corporations and their successors and assigns.  As a matter of

legal interpretation, therefore, CTS may be found to be liable for TJ's alleged violations

of the statute.[11]

---

[11] Because statutory language leads to this result, the court does not reach Defendant's argument that the court should not infer successor liability into penalty actions.  *See Barnhart*, 534 U.S. at 450.  Moreover, Defendant's argument that the use of the term

### b. Choice of Law

The court has, in varying cases, applied both state law and federal common law

when determining whether a successor corporation is liable for the actions of its

predecessor pursuant to § 1592.  *Compare Adaptive Microsys., LLC*, 37 CIT at __, 914

F. Supp. 2d at 1338 (applying Wisconsin law in penalty and recovery actions), *with*

*Ataka Am., Inc.*, 17 CIT at 600, 826 F. Supp. at 498 (applying federal common law in

recovery action).  The court need not address this issue at this time, however, because

Michigan law and federal common law on successor corporate liability are similar and

would appear to lead to the same outcome in the present motion.[12]

---

"drawback successor" in 19 U.S.C. § 1313(s) demonstrates that, if Congress had
wished for successors to be included in § 1592, it would have incorporated the word
"successor" into the statute, is unavailing.  Section 1313 establishes multiple complex
duty drawback procedures that require context-specific terms of art to explain.  *Cf.*
*Merck & Co. v. United States*, 30 CIT 726, 731, 435 F. Supp. 2d 1253, 1258 (2006)
(noting that duty drawback statutory scheme "is inartfully drafted"), *aff'd*, 499 F.3d 1348
(Fed. Cir. 2007).  One such term of art, which is used nowhere else in the U.S. Code, is
"drawback successor," the definition of which Congress lays out in § 1313(s)(3).  The
court is not persuaded that the term's singular appearance in § 1313 illuminates the
meaning of "person" in § 1592.

[12] Supreme Court rulings suggest that the court should favor applying state law in these
contexts, holding that "cases in which judicial creation of a special federal rule would be
justified . . . are . . . few and restricted."  *Atherton v. FDIC*, 519 U.S. 213, 218 (1997)
(ellipses in original) (citations and quotation marks omitted).  "[T]he existence of related
federal statutes" does not indicate that Congress intended to create a body of federal
common law, "for Congress acts . . . against the background of the total *corpus juris* of
the states."  *Id.* (ellipses in original) (citations and quotation marks omitted).  Therefore,
the Court has concluded that, "when courts decide to fashion rules of federal common
law, the guiding principle is that a significant conflict between some federal policy or
interest and the use of state law . . . must first be specifically shown."  *Id.* (ellipses in
original) (citations and quotation marks omitted).

Michigan law adheres to the "'traditional rule of nonliability for corporate successors who acquire a predecessor through the purchase of assets.'"  *Stramaglia v. United States*, 377 F. App'x 472, 474 (6th Cir. 2010) (quoting *Foster v. Cone-Blanchard Mach. Co.*, 460 Mich. 696, 702 (1999)).  The state, however, recognizes "five narrow exceptions" to the rule, only one of which is relevant to the present case:  "where the transferee corporation [i]s a mere continuation or reincarnation of the old corporation." *Id.* at 475 (quoting *Foster*, 460 Mich. at 702); *Craig v. Oakwood Hosp.*, 471 Mich. 67, 97 (2004) (footnote omitted).  To discern whether a corporation is the mere continuation of another, the court "examine[s] the totality of the circumstances and engage[s] in a multi-factor analysis."  *Stramaglia*, 377 F. App'x at 475 (citing *Pearce v. Schneider*, 217 N.W. 761, 762 (Mich. 1928); *Ferguson v. Glaze*, No. 268586, 2008 WL 314544, at *5 (Mich. App. Feb. 5, 2008); *Shue & Voeks, Inc. v. Amenity Design & Mfg., Inc.*, 511 N.W.2d 700, 702 (Mich. App. 1993)).  "The only indispensable prerequisites to application of the exception appear to be common ownership and a transfer of substantially all assets," *id.* (footnote omitted) (citing *Pearce*, 217 N.W. at 762; *Gougeon Bros. v. Phoenix Resins, Inc.*, No. 211738, 2000 WL 33534582, at *2 (Mich. App. Feb. 8, 2000); *Shue & Voeks, Inc.*, 511 N.W.2d at 702); *accord City Mgmt. Corp. v. U.S. Chem. Co.*, 43 F.3d 244, 251 (6th Cir. 1994), although "no Michigan court has found these factors alone sufficient to justify imposition of successor liability," *Stramaglia*, 377 F. App'x at 475 n.2.  After these two factors, the most important element is whether the successor corporation conducts the same business as the predecessor.  *Id.* at 475 (citing *Pearce*, 217 N.W. at 762; *Shue & Voeks, Inc.*, 511 N.W.2d at 702; *Ferguson*, 2008 WL 314544, at *2).  The court

also may consider such factors as whether the new corporation retained the old

corporation's employees and officers, maintained the old corporation's place of

business, or selectively repaid the old corporation's debts.  *Id.* at 475-76 (citing

*Ferguson*, 2008 WL 314544, at *5; *Shue & Voeks, Inc.*, 511 N.W.2d a 702; *Gougeon*

*Bros.*, 2000 WL 33534582, at *2).

        Under federal common law, "a corporate successor is responsible for its

predecessor's debts . . . if . . . (3) the successor is a mere continuation of its

predecessor."  *Ataka*, 17 CIT at 600-01, 826 F. Supp. at 498 (citing *Bud Antle, Inc. v. E.*

*Foods, Inc.*, 758 F.2d 1451, 1456 (11th Cir. 1985) (citing law of several federal district

and circuit courts)).  "In other words, [if] the purchasing corporation is merely a 'new hat'

for the seller, with the same or similar management and ownership."  *Bud Antle, Inc.*,

758 F.2d at 1458 (citation omitted).  A continuation occurs when "a new corporation,

which purchases all the assets of the old, proceeds exactly as if it were the old

corporation."  *Ataka*, 17 CIT at 602, 826 F. Supp. at 499 (citation omitted).  A continuity

of officers, directors, and stockholders are "key element[s]" indicative of a continuation.

*Id.* (citing *Bud Antle, Inc.*, 758 F.2d at 1458-59); *see KAB Trade Co.*, 21 CIT at 301

(noting that two companies "had the same registered agent and shared at least one

officer," and "had the same address and engaged in the same import activity").

### c.  Discussion

        The court finds that there are genuine issues of material fact as to whether CTS

is a mere continuation of TJ and, thereby, liable for TJ's actions, which prevent the court

from granting summary judgment for CTS.  From its inception, TJ was a family-run

business and, after 1991, completely owned by Mr. Mularoni.  (PM Dep. 13:12-18, 14:7-11, 16:14-17; KM Dep. 31:5.)  According to CTS's operating agreement, dated January 2011, Mr. Mularoni's wife, Ms. Mularoni, owned 99 percent of the company, and their daughter owned the remaining one percent.  (PApp. 121-22; KM Dep. 98:13-18.)  Documents from October 2013 and August 2014, however, indicate that Mr. and Ms. Mularoni are CTS's members, (PApp. 244, 246), which makes them owners of the firm under Michigan law.  *See Runco v. Francis*, No. 317926, 2015 WL 3796060, at *4 (Mich. Ct. App. June 18, 2015).

The record also indicates that all of TJ's assets were transferred to CTS.  On January 20, 2011, Tile Holding acquired all rights, title, and interest in TJ's assets in return for a $500,000 loan.  (PApp. 197; DApp. Tab H.)  CTS then acquired all rights, title, and interest in the TJ assets from Tile Holding in exchange for a $500,000 loan.  (PApp. 108, 208; DApp. Tabs F, H.)  That CTS did not acquire TJ's assets directly does not preclude a finding that CTS is the mere continuation of TJ.  *See Foster v. Cone-Blanchard Mach. Co.*, 460 Mich. 696, 704 (1999).

Numerous indicia also suggest that CTS conducts the same business as TJ.  TJ's business consisted of selling ceramic, tile, marble, granite, and other related products, as well as selling straight edge polishing machinery with cut and polish capabilities.  (PM Dep. 24:1-8, 60:9-14; DApp. Tab R.)  CTS imports tile, marble, granite, and stone and sells polishing machines.  (KM Dep. 87:1-16; MW Dep. 31:22-32:10.)  CTS has a list of TJ's customers, indicating that it may share common customers with TJ, and CTS undisputedly shares common vendors with TJ for certain

commodity items.  (DApp. Tabs F, N; CTS Dep. 45:2-20, 54:2-16.)  When representing

itself to the public on various advertising fliers, company forms, and business cards,

CTS appears to invoke TJ's name recognition, referring to itself as "Ceramic Tile and

Stone / T.J. Granite and Stone," (DApp. Tabs F, M, N).  The signage on CTS's exterior

has the words, "Ceramic Tile and Stone," placed above the words, "T.J. Granite and

Stone," (CTS Dep. 64:15-22).  CTS also alludes to TJ through the firms' usage of

numerous assumed names.  TJ's assumed names, Ceramic Tile Sales Inc., T.J.

Imports Inc., TJ Marble & Granite Shop, Marmo Meccanica U.S.A., Sileston of

Michigan, Inc., Delta Diamond Tools, and Marble & Granite Gallery, (PApp. 137-51),

bear a strong resemblance to those of CTS, T.J. Granite & Stone, T&J Marble & Stone,

Delta Diamond Tooling, Ceramic Tile & Stone, and Marmomachinery, (PApp. 105).

CTS also occupies the same physical location as TJ and uses TJ's website, address,

and telephone number.  (DApp. Tabs F, J; MW Dep. 60:3-5.)

        CTS also retained TJ's employees and officers.  When TJ ceased operations in

January 2011, it had eight employees, all of whom began working at CTS in February

2011.  (MW Dep. 13:11-22, 52:4-11.)  From 1991 onward, Mr. Mularoni served as TJ's

president.  (PM Dep. 13:7-18, 14:7-11.)  Although Ms. Mularoni served as CTS's

manager after the company's formation, (PApp. 121-22; KM Dep. 98:22-99:3), she was

unable to answer questions about certain aspects of CTS' operations and

acknowledged receiving guidance from Mr. Mularoni, suggesting that her role may have

been nominal and that Mr. Mularoni may have continued to manage the enterprise.

(*See, e.g.*, KM Dep. 69:1-3, 6-9, 71:2-10, 19-23, 72:8-12; PM Dep. 10:14-24, 11:2-17;

MW Dep. 30:3-6; DApp. Tab F.)  At least by October 2013, it appears that Mr. Mularoni had become the CEO of CTS.  (PApp. 244.)

The question before the court is whether there are undisputed facts sufficient to grant Defendant summary judgment on the issue of whether CTS is a mere continuation of TJ.  As to that question, the answer is "no."  The facts discussed above could lead a reasonable jury to conclude that CTS operates as a mere continuation of TJ. Ultimately, the fact-finder, among other things, will have to evaluate the credibility of the individuals involved in the transition from TJ to CTS at trial.  The court therefore denies Defendant summary judgment on the issue of whether CTS is liable for TJ's actions. *See Anderson*, 477 U.S. at 248.

## CONCLUSION

For the reasons above, the court denies Defendant's motion for summary judgment.  An order follows.

/s/      Mark A. Barnett
Mark A. Barnett. Judge

Dated: June 30, 2015
New York, New York